ALVIN MFG. CO. v. SCHARLING.

(Circuit Court, D. New Jersey. March 6, 1900.)

1. PATENTS—SUIT FOR INFRINGEMENT AGAINST ASSIGNOR—ESTOPPEL.
   An inventor who has assigned the patent for his invention cannot be permitted, in a suit against him for its infringement, to introduce evidence for the ostensible purpose of so narrowing the scope of the patent as to avoid infringement, but which in fact tends to show that it is invalid for want of novelty.

2. SAME—INFRINGEMENT—LIABILITY OF PARTNER.
   A defendant cannot escape liability for infringement on the ground that the infringement was by a partnership, when it is shown that he was not only a member, but the manager, of the firm under whose superintendency the patented process was used and the infringing product sold.

3. SAME—PROCESS FOR DECORATING GLASS.
   The Scharling patent, No. 472,230, for a process of decorating glass with metal and for the resulting product, held infringed.

In Equity.

This was a suit in equity for infringement of a patent. On final hearing.

George Cook, for complainant.
Dickerson & Brown, for defendant.

GRAY, Circuit Judge. This is a suit brought to restrain infringement of letters patent No. 472,230, granted April 5, 1892, to the Wymble Manufacturing Company, as assignee of John H. Scharling, the defendant, for an improved process of decorating glass. The bill recites that John H. Scharling, being the first and original inventor of certain new and useful improvements in processes for decorating glass, made application for letters patent therefor, in due form of law, and complied with all the requirements of the statute in such cases made and provided, and that by an instrument in writing dated February 11, 1891, he sold, assigned, and transferred unto the Wymble Manufacturing Company, a New Jersey corporation, all of his right, title, and interest in and to the invention, and in

the letters patent to be granted therefor, and requesting that the commissioner of patents issue the letters patent to said company; further, that the letters patent were issued in accordance with the petition on the 5th day of April, 1892, and numbered 472,230, to the Wymble Manufacturing Company, as assignee of said Scharling; further, that a receiver was appointed for the Wymble Manufacturing Company in a certain suit brought in the court of chancery in the state of New Jersey against the said company. On the 27th day of March, 1895, the said receiver, with the approval of the said court, sold to the complainant, the Alvin Manufacturing Company, all the property and assets of the said Wymble Manufacturing Company, including all debts due to said company, on book account or otherwise, the bill of sale purporting to include also the patent or patent rights now in suit. Thereafter an application was made to the said court of chancery by complainant for an order directed to the Wymble Manufacturing Company ordering the directors of the same to hold a meeting, and authorize the proper officials to execute an assignment of said patent to the complainant. The order was obeyed by the said directors, and an assignment in pursuance thereof of the said patent was made by an instrument in writing executed by the president and secretary of said company, and dated May 13, 1895. After the last-mentioned date, therefore, the complainant was vested with the full legal title to the patent in suit. The patent in suit relates, as is stated in the specification, to "an improvement in decorating glass and other ware with metal, and more particularly to the decoration of articles having nonconducting surfaces with gold, silver, or other precious metal, or with any two or more of the same." The specification describes that, in depositing the metal upon glass or other nonconducting surfaces, the deposit forms upon the underside thereof, while the upper side or sides remain uncovered, or only imperfectly covered, and that, therefore, in decorating articles of a round, oval, cylindrical, or of other shape than flat, it had been the custom to first apply to the nonconducting surface a coating of varnish or some adhesive gum, and then applying to said gum or adhesive a coating of some metallic powder, in order to render the surface of the article a conducting one. The article was then submerged in a plating bath, and a heavy or thick coating deposited thereon, portions of the metal being cut away by etching or engraving. As the specification states, articles thus treated were open to certain objections, namely, that the inner surface of the metal envelope, exposed through the open-work design, was dark or black, and of an unsightly appearance, and greatly detracted from the beauty and artistic appearance of the article. Especially was such the case with objects having a large open top, as cups or bowls, wherein the black inner surface of the metal was plainly visible. One object of the invention was to overcome this objection, and to give to the article a bright inner surface. The specification further states that in practicing the old process the articles required a great amount of handling before they were in readiness for the electroplating bath, and hence the danger of breakage was correspondingly great. Further, it was the object of the

invention to overcome the defects in the process and product "by first cheapening the process, and therefore the product; secondly, producing an article with a bright inner surface, thereby adding to, instead of detracting from, the artistic appearance and value thereof; and, thirdly, to devise a process whereby the necessity of so much handling of the article will, to a greater extent, be overcome, and the danger of breakage lessened." In accomplishing these ends, the inventor states that he dispenses entirely with the first two steps of the old process, omitting, first, the step of applying the adhesive, and, secondly, the plumbago or metallic powder, and forms directly on the article a thin coating or envelope of silver or other conducting metal. The inventor then states that others had attempted to accomplish this end by immersing the article in a bath for the purpose of allowing the metal in solution to deposit thereon, but that such process was impractical, owing to the fact that the metal in solution would deposit on the under sides, but not on the upper sides, of the article, "and also by reason of the fact that the solution—an item of great expense—in a few minutes becomes worthless, by reason of the precipitation of the metal therein, the quantity necessary to completely submerge the article being very large." In producing his new and improved article of manufacture, in accordance with his newly-invented process, the patentee states that he selects one of the solutions ordinarily used in making mirrors, and after determining the amount thereof to be used, in accordance with the size of the article to be treated, suspends the bottle or other article at one end of a wire or cord, by inserting into the mouth or neck of the bottle a suitable stopper, and attaching the wire thereto, the opposite end of the wire being attached to the ceiling or other convenient place, the article being so suspended that it may be easily turned or revolved, a swivel, if necessary, being used to prevent the wire or cord from twisting. "The article being in position, the solution contained in the vessel, A, is, by means of a cup or ladle, dipped therefrom, and poured over the article, C; the latter, if necessary, being slowly turned, in order that the solution may come in contact with every part of the surface thereof. That portion of the solution not adhering to the surface of the article is caught by the receptacle, A, and again ladled out and poured over the article; this process being repeated until every part of the surface is coated. I have found from my experiments that the surface will take but a certain thickness of film, or, in other words, that the film will assume but a certain thickness, no matter how often, or for what length of time, the process of pouring the solution over the article is kept up. This being the fact, there is no danger of loss by too thickly applying the primary coating of metal. After the article has been thus treated, and received a bright film of silver or other metal, it is subjected to the electroplating bath, and the gold, silver, or other precious metal deposited thereon in the ordinary manner. By cutting, etching, or other processes, a part or parts of the metal may be cut away, as has heretofore been done, and as shown in Fig. 2 of the drawings. The above process is the quickest, most economical, and produces

the prettiest articles of any process of which I am aware." The claims of the patent in suit read as follows:

"(1) The process hereinbefore described of applying metal to articles having nonconducting surfaces, which consists in repeatedly pouring a solution of metallic salts over the article until the latter is completely covered, slowly turning or moving the article during such process, and finally subjecting said article to the action of an electroplating bath. (2) A glass or other article of a round or irregular shape, having applied directly on its surface a thin film or envelope of deposited metal, producing a bright inner surface on the article, and a second deposit of thicker metal applied to the first deposit, certain portions of said metals being cut away, as described."

The first claim is for a process, and the second is for the resulting product of that process. The two defenses made by defendant are— First, that, by reason of the prior state of the art, the claims of the patent in suit are so limited that no act of this defendant can be considered as an infringement thereof; and, second, the defendant denies that he has practiced or used the invention as contained in said letters patent, or that he has sold or made any articles in accordance therewith. In support of the first defense, the defendant has put in evidence the Power, Cimeg, Pratt, and Zgraggen patents, some of them very old, and all of them antedating the patent in suit, and certain publications, all of which he claims tend to show that it was old at the date of the application of the patent in suit to deposit a film of silver directly upon a nonconducting surface, such as glass, by pouring the silver solution repeatedly over the same, and then to cover said film by electro deposition of metal upon it. He has also introduced the testimony of witnesses tending to show that the product described in claim 2 was old. It is to be observed that this suit has been brought against John H. Scharling, the inventor of the process, and assignor of the letters patent in suit, and he is therefore estopped from denying the validity of the patent. Defenses that would be open to others sued for an infringement of the patent in suit are not open to him. Counsel for defendant do not deny this proposition, which rests upon well-established principles lying at the foundation of the doctrine of estoppel. They contend, however, that the defendant may still, by showing the prior state of the art, so limit the scope of the invention covered by the patent as to leave any process practiced by defendant, or product made by him in pursuance thereof, outside of the claims of the patent in suit.

I think the evidence adduced for this purpose, and which has been referred to above, would, if it had the effect intended, confine the first claim to a process in which the article to be treated was "slowly turned or moved" during such treatment. But I cannot consider this evidence in this way. It attacks the validity of the claim in its entirety. The "slowly turning" of the article is not entitled to be called a distinct step in the process, and cannot properly be separated from the process as a whole. The defendant must not be permitted to stultify himself, by asserting that the simple act of "turning" the article slowly, while it received its baptism of silver solution, was the process he invented. This evidence must be considered, then, as tending to deny the validity of the patented pro-

cess, by showing that it lacked novelty, and therefore cannot be received or considered in this suit, when offered by this defendant. The same observations would be applicable to the contention in regard to the second claim, as it must refer to an article made pursuant to the process thus limited.

Evidence tending to prove that glass bottles and other round or irregular shaped glass articles have been decorated with silver or other metal, showing a bright inner surface next the glass, before the date of this patent, is evidence that attacks its validity by showing want of novelty. As I said before, such a defense is not open to the defendant in this case. I do not, however, pass upon the question whether this evidence would or would not be sufficient to defeat a suit on this patent, brought against other parties than this defendant. I think the complainant in this case has sufficiently established, by his original and supplementary proof, the fact that this defendant, John H. Scharling, has practiced the process of the patent in suit since his assignment thereof, and since the title has been in complainant. I think he has also established, by the same proof, that the said defendant has made, dealt in, and used the articles covered by the second claim of the patent in suit. It is true that the defendant in his answer has, upon oath, denied in general terms that he has in any way infringed the rights secured by said letters patent, by "unlawfully" or "wrongfully" using or practicing the process, or in making, using, or selling any articles made in accordance therewith. This denial puts upon the complainant the burden of overcoming it by preponderating testimony, which must generally be that of more than one witness, or that of one witness with corroborative circumstances. A careful examination of the testimony in this case has brought the court to the conclusion that this has been done.

I have no doubt, upon the testimony of Frederick W. Bray and others, that the decorated bottles produced in evidence, and filed as exhibits, were bought from the defendant. It is true that the defendant testifies that the business was carried on by a partnership, consisting of Helene Scharling, John H. Scharling, and Joseph W. Haythorn, and that the articles bought and produced in evidence were bought from the firm so constituted. It is also in testimony that the defendant had general supervision of the decoration of these bottles and other articles, and by the testimony of Mr. Benjamin, one of the witnesses for the defendant, it appears that he made experiments in Scharling's establishment in Newark, in the presence of Scharling; that Scharling provided him with the silver solution which he (Scharling) ordinarily used to produce silver film on glass bottles; that he gave him two large bottles, each partially full of the solution; that the bottles upon which he made the experiments were given to him by Mr. Scharling, and were "those which Mr. Scharling plates and covers for the market." Mr. Scharling showed the witness how to pour the solution over the bottles. He saw him do it, and saw him produce the film thereon. He showed him how to put in the cork and attach the rod that was to hold the bottle for convenient turning, and that all the tools and devices

used by the witness were those used by Scharling in the same way. We find, therefore, that Scharling was supervising the business carried on in the name of the firm, and that it was equipped with the appliances and devices necessary to practice the process, and produce the articles covered by the patent in suit.

Again, President Henry Morton, a distinguished expert, called on behalf of the complainant, testifies that the bottles produced in evidence, and above referred to, were precisely like those made under the process of the patent in suit; that he had examined them superficially and microscopically, and was convinced that they were produced by the same method described in the Scharling patent; that in his experience as an expert, and from his examination in this case, he had been unable to discover the result attained in these bottles, when made by any other process than that of the patent in suit. It is plain that Scharling was the managing and controlling superintendent of the firm of Scharling & Co., and he cannot be permitted to relieve himself of responsibility by interposing the firm through which, it is evident to the mind of the court, he acted. It is not without significance that when the defendant, John H. Scharling, was called to testify by the complainant, he was silent in regard to the process by which the bottles obtained from the firm of John H. Scharling & Co. were made. Nor did he avail himself of the liberty to deny that the bottles in evidence were made by the process described in the patent, nor did his counsel, by cross-examination, direct his attention to that point.

I conclude, therefore, that, under all the circumstances, the testimony must be taken as preponderating upon the side of the complainant's allegation that John H. Scharling has infringed the rights secured by the patent in suit. If, however, the evidence as to actual past infringement, prior to the bringing of the suit and after the acquisition of title by the complainant, were less satisfactory, it would still remain true that there is undisputed evidence of the manufacture and sale by Scharling & Co. of articles precisely similar to the ones already described, since the bringing of this suit. It is in evidence that since the bringing of the suit the firm of Scharling & Co. has been incorporated, but it is clear that the defendant bore the same relation to the corporation, and the corporation to him, as existed between the firm and him. This testimony, taken in connection with the other testimony in the case, supports the allegation in the bill of intended infringement and trespass upon the rights secured by the patent in suit, and justifies the prayer of complainant for the issuance of an injunction by this court. Let a decree be framed accordingly.