AUTOMATIC SWITCH CO. v. MONITOR MFG. CO. et al.

(Circuit Court, D. Maryland. June 15, 1910.)

1. PATENTS (§ 129*)—ASSIGNMENT—EFFECT AS ESTOPPEL—CORPORATION OR-
GANIZED BY ASSIGNOR.

A corporation organized by a patentee, who subscribed for two-thirds
of the stock and paid for it with money received from another corpora-
tion to which he assigned the patent, is bound by his estoppel, and can-
not question the validity of the patent, nor introduce evidence so to
limit its construction as to render it worthless.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 182½–186; Dec.
Dig. § 129.*]

2. PATENTS (§ 177*)—CLAIMS—COMBINATION—EFFECT.

Every part of a combination claimed in a patent is presumed to be ma-
terial to the combination, and in a suit for its infringement evidence to
the contrary is not admissible.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 253, 254; Dec.
Dig. § 177.*]

3. PATENTS (§ 168*)—CONSTRUCTION—ACQUIESCENCE IN REJECTION OF CLAIMS.

A patentee who originally sought broader claims which were rejected,
and who acquiesced in such rejection, cannot insist on such a construc-
tion of an allowed claim as would cover what had been previously re-
jected.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 243½–244; Dec.
Dig. § 168.*]

4. PATENTS (§ 202*)—ASSIGNMENT—EFFECT AS ESTOPPEL.

In a suit for infringement by the assignee of a patent against the as-
signor, where it is not shown that the assignor made any representations
other than those necessarily involved in the assignment, he is estopped
only to deny that the invention presented a sufficient degree of utility to
justify the issuance of the patent, and with this limitation the court will
apply the same rule of construction which would be applicable between
the patentee and a stranger, and, on the question of infringement, the
defendant may show the prior state of the art to limit the scope of the
claims sued on.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 281–289; Dec.
Dig. § 202.*]

5. PATENTS (§ 328*)—INFRINGEMENT—ELECTRIC SWITCHES.

The Whittingham patents, No. 716,504 and No. 757,853, for improve-
ments in electric switches, construed, and *held* not infringed.

In Equity. Suit by the Automatic Switch Company against the
Monitor Manufacturing Company and George H. Whittingham. De-
cree for defendants.

Clifton V. Edwards and R. Lee Slingluff, for complainant.

Barton, Wilmer, Ambler & Stewart and Robert Watson, for de-
fendants.

ROSE, District Judge. This is a suit in equity for an alleged in-
fringement of certain claims of patents 716,504 and 757,853, both
originally issued to George H. Whittingham, one of the defendants.
In 1888 Whittingham, then about 20 or 21 years of age, applied
for a patent for an automatic switch for electric motors. He or-
ganized the Automatic Switch Company of Baltimore City and sub-

scribed for all its stock. He paid for it by (1) assigning the patent to be issued, and by agreeing to assign (2) all foreign patents he might obtain for the same invention, and (3) any improvements upon said switch or any contrivance or device whatsoever which he might invent or in any wise become possessed of or interested in, bearing upon a switch for operating electric currents. He remained in the employ of the company for nearly 16 years. During that time he obtained a number of patents. Some, including the two in suit, were for improvements in switches. Some were for other electrical devices. The company at its own cost prosecuted the application for all these patents, and all of them were assigned to it. In 1897 one David H. Darrin became the New York sales agent of the Automatic Switch Company. In 1898 the company gave him for five years the exclusive agency for the sale of its goods in Greater New York and New Jersey. He says as the direct outcome of this agency he went into the elevator business on his own account. Its success, he testifies, depended largely upon his control in the New York territory of the Automatic Switch Company's products. In 1901 Whittingham told Darrin he would like to buy the stock of the Automatic Switch Company, the majority of which was then and had been for many years in other hands. Whittingham says that Darrin asked to share in the purchase. Darrin says Whittingham asked for his help, and to get it showed him the agreement of September 5, 1888, binding Whittingham to assign all future switch inventions to the company. Whittingham denies that he ever showed Darrin that agreement or said anything about it. He claims never to have seen it from the day on which it was executed until it was offered in evidence in this cause. However this may be, Whittingham and Darrin agreed to buy the stock not owned by Whittingham and to pay for it something over $9 a share. It was planned that each should get one-half of the total issued stock, and that the salary to be paid each by the company should be the same. Nothing was said about the Darrin agency contract. Neither had sufficient ready money to pay for the stock. Each indorsed for the other. Whittingham lent Darrin $600 in cash. Darrin was elected president. They got along well together until Darrin wanted a renewal of the exclusive agency contract for the D. H. Darrin Company which he had organized and to which he had assigned the contract. Whittingham did not want to renew it. Darrin as president of the company, but without the authority of the directors, gave a new contract to a clerk of the Darrin Company and the latter immediately assigned the contract to that company. At the next election the directors of the Automatic Switch Company declined to re-elect Darrin president and put Whittingham in his place. While Whittingham was president the company sold its switches in the New York territory to anybody who wanted to buy them and could pay for them. Darrin, so long as he did not control the New York agency, would not use the Automatic Company's switches in any elevator built by his company. He testifies that rather than buy Automatic Company's switches when other people in the same territory could buy them he used other switches so inferior in quality that it seriously injured the reputation

of the Darrin elevators. He seems to have persuaded himself that he had the right to the exclusive agency, no matter what the other stockholders of the switch company thought about it.

Meanwhile the struggle between him and Whittingham for the control of the Automatic Switch Company was carried into the courts. Darrin obtained an injunction restraining Whittingham from voting certain shares of stock at the annual election for directors to be held in January, 1904. The company's by-laws said that no election could take place unless a majority of the stock was represented at the meeting. Whittingham stayed away to break a quorum. Darrin came. A little over one-third of the shares were represented. Darrin's friends were elected directors. The Court of Appeals of Maryland finally held that under the state corporation law as it then stood the shares present at an annual meeting could elect whether they were a minority of the whole number or not, and no matter what the company's by-laws might say about it. So soon as this decision was handed down, Darrin took control and put an end to Whittingham's connection with the company in any capacity other than as a stockholder in it. Whittingham swears, and Darrin does not deny, that Darrin said he would never allow the company to make a dollar so long as Whittingham had any stock in it. Whittingham offered to buy Darrin's stock. Darrin would not sell unless given the exclusive New York agency. On those terms Whittingham would not buy. Whittingham began legal proceedings to secure control of the annual election to be held in January, 1905. Then an agreement was made. Darrin was to dismiss all the suits against Whittingham, several of which were pending. He was to pay Whittingham $20,000, and to pay the agent who negotiated the arrangement $2,500. In return all the Whittingham stock was to become Darrin's. Darrin dismissed the suits. A time and place for the payment of the money and the transfer of the stock was appointed. Darrin came bringing his money in large part in $5 and $10 notes. It took time to count these. While the parties were still together, a deputy sheriff appeared with an attachment in a new suit that Darrin had caused to be brought against Whittingham. Whittingham had taken the precaution to transfer the stock to the name of the agent. The latter claimed that the stock was his, and he had sold it to Darrin, and that the money to be paid for it belonged to him. Darrin dropped the attachment. Whittingham says he feared Darrin would bring other suits against him. Therefore, so soon as he received his $20,000, he invested it. How he does not say. He at once transferred these investments to his wife. Darrin did bring two other suits. Why the record does not disclose. The defendants' brief says they were fruitless. A very little while after Whittingham sold his stock, he came to Baltimore. He called at the shop of one William C. O'Brien, whom he had known for a long while. Some eight years before O'Brien had been in the employ of the Automatic Switch Company. Whittingham says that O'Brien was working on some original electrical devices for some of which he was seeking patents. O'Brien and Whittingham agreed to form a corporation. Mrs. Whittingham was to pay $2,400 for two-thirds

of the stock; O'Brien $1,200 for one-third. The company was to buy O'Brien's business, inventions, patents, and machinery for $2,-200. It was a part of the bargain that the company should employ Whittingham as one of its officers. What was agreed to be done was done. The corporation was organized under the name of the Whittingham Manufacturing Company, and started its career with O'Brien's business and $1,400 of cash. After the bill in this case was filed, the company changed its name to the Monitor Manufacturing Company. O'Brien still holds one-third of the stock which was issued to him. Mrs. Whittingham still has the two-thirds which were issued to her, less one share transferred to her husband, the defendant Whittingham. The new company manufactures and sells electric switches.

The defendants in this case are George H. Whittingham and the Monitor Manufacturing Company. The complainant is the Automatic Switch Company, a New York corporation, which has succeeded to all the business, property, and patents of the Automatic Switch Company of Baltimore City. The evidence leaves no question that the complainant company is controlled by Darrin. It does not appear that any one else has any substantial interest in it. At the time of the filing of the bill, a motion for a preliminary injunction was made and after hearing upon affidavits was granted. The evidence has now been taken in regular course and the case submitted after final hearing.

The story of the relations of the parties to each other has been told at length, because it is necessary to decide how far the defendants are estopped in this case from making defenses which but for those relations would be open to them. The defendant George H. Whittingham was the patentee of both patents in suit. He assigned them to the corporation under which the complainant takes title to them. He admits that he cannot be heard to question their validity. His codefendant, the corporation now calling itself the Monitor Manufacturing Company, says that it is not bound by his estoppel. Under the circumstances in evidence this contention should not be sustained. A corporation which is alleged to infringe the patents owned by another may show that these patents are invalid in spite of the fact that their vendor is one of its officers and stockholders. Babcock & Wilcox Co. v. Toledo Boiler Works, 170 Fed. 81, 95 C. C. A. 363. In the case at bar two-thirds of the capital of the defendant corporation came from money which a few days or a few weeks before had been paid the vendor of the patents for his stock in the company to which he had sold them. The defendant company was in large part organized for the purpose of giving him employment. Two-thirds of the stock is held by him and his wife. The company does whatever he wills it to do. Under such a state of facts the company is bound by his estoppel.' Time Telegraph Co. v. Himmer (C. C.) 19 Fed. 322; Alvin Mfg. Co. v. Scharling (C. C.) 100 Fed. 87; Marvel Co. v. Pearl (C. C.) 114 Fed. 946; Continental Wire Fence Co. v. Pendergast (C. C.) 126 Fed. 381; Mellor v. Carroll (C. C.) 141 Fed. 992.

How far does the estoppel against the defendants go? They have the right to say that they do not infringe. In this case that is what they do say. Before the court can tell whether in so saying they say truly, it must find out what the patents in suit cover. The buyer of a patent for one invention has no right to say that the seller shall not use another invention. If A. sells B. Blackacre, B. cannot claim Whiteacre as well. It is sometimes impossible without reference to the prior state of the art to tell what a patent means. In such cases the state of the art may be proved. Until it is proved, no one can say what it is the defendants are estopped to deny. On the other hand, a vendor of a patent when sued for its infringement cannot say that the patent which he sold as good is bad. What he may not do in one way he will not be let do in another. It follows that he may not offer evidence so to limit the construction of the patent as to make it worthless. Alvin Mfg. Co. v. Scharling (C. C.) 100 Fed. 87; Hurwood Mfg. Co. v. Wood (C. C.) 138 Fed. 835. Courts of high authority differ as to where the line should be drawn between that evidence of the prior art which may sometimes be admissible on behalf of the vendor of a patent subsequently sued for its infringement, and that evidence of such art which when offered by the vendor may never be received.

In this case the complainant says that the defendants infringe claims 1 and 8 of patent 716,504, December 23, 1902, and claims 8, 9, 10, 11, and 12 of patent 757,853, April 19, 1904. Both of these patents are for improvements in the construction of electric switches. While the later in date is said to be an improvement on the earlier, the claims of the younger alleged to be infringed each contain an element not shown or claimed in the older. It is conceded that, if the defendants infringe any one of these claims 8 to 12 of patent 757,-853, they infringe all of them. The purpose of an electric switch is to make and break an electric current. When the current is broken, there is an electrical discharge through the air, the visible evidence of which is the electric spark. This sparking or arcing, as it is technically called, if uncontrolled may do damage. It is controlled by placing an electro-magnet close to the point at which the switch opens. Electricians call an electro-magnet, used for making harmless what would otherwise be a dangerous discharge, a blow-out device, because they say it blows out or disrupts the arc which is formed when the switch is open. There is no question that all this was known years before the date of the earlier of the patents in suit. When Mr. Whittingham designed the improvements in electric switches shown in the later of the patents in suit, it occurred to him that it would be a good thing to make the electro-magnet or blow-out device do double duty. In his scheme it not only does its own necessary work, but it forms an arm of the switch itself. He fitted it with a contact surface so that when it touched the other arm of the switch the circuit was closed. He thought so well of this idea that he made it an element of each one of the five claims of patent 757,853 now in suit. The record does not show what special advantage in practical use this arrangement has. Complainant says it has none. It claims that the defendants infringe, although in their

alleged infringing switch the blow-out device is not itself an arm of the switch nor has it a contact surface. The complainant says that the blow-out device serves the same purpose, neither more nor less, whether it has or has not the contract surface and whether it does or does not form an arm of the switch. Whether the complainant is or is not right seems to me immaterial. A blow-out device forming part of the switch and having a contact surface is an element of the combination in every one of the claims in suit. The law is well settled that every part of the combination claimed is conclusively presumed to be material to the combination. No evidence to the contrary is admissible in any case of alleged infringement. Walker on Patents, § 349; Hubbell v. U. S., 179 U. S. 82, 21 Sup. Ct. 24, 45 L. Ed. 95. It follows that the devices used by the defendants are not within any one of the claims 8 to 12, inclusive, of patent 757,853, and that consequently those claims are not infringed by the defendants.

Two questions are still to be answered. First. Do the defendants infringe either claim 1 or claim 8 of patent 716,504? Second. If, in point of fact, they do not infringe either of them, are they estopped to say they do not?

The patent in suit says that the invention relates to improvements in electric switches for reversing the current in electric motors. It declares that the invention is specially applicable for use in connection with electric elevators. It explains that one of its objects is to provide such an arrangement of parts that, when the connection with the supply circuit is broken at one side of the switch for the purpose of stopping or reversing the motor, the armature and field circuits will remain closed, and will not be opened except when the motor circuit contact blades are just about to enter the supply circuit terminals on the opposite side of the switch. This arrangement it is said affords the armature time to slow down and stop and exhaust its electro-magnetic current before the armature and field circuits are broken preparatory to the reversal of the current in the armature, thereby avoiding the destructive arcing of the terminal and contact blades which results when the armature and field circuits are broken while the armature is rotating. Certain other objects are specified, but they do not apparently relate to the particular claims in suit.

After the enumeration of the objects of the patent, the patentee proceeds to say:

"With these and other objects in view the invention consists in certain electrical and mechanical features of construction, arrangements and combinations of the parts hereinafter fully described and claimed."

The first claim in suit is as follows:

"In an electric-elevator system, the combination with a motor-supply circuit and contact blades and terminals for closing and opening the same, of an armature-circuit arranged to remain closed until after said contact-blades have been brought to and past the stop position."

In the defendants' devices which are alleged to infringe, the contact blades are never moved beyond the stop position. The complainant says that all the claim means is that the armature circuit shall remain

closed after in point of time the contact blades have been brought to the stop position, and that the claim does not require that after the contact blades have reached the stop position they shall actually keep moving in the same direction beyond that position. Should this claim be so understood? It is possible to put such a construction upon its words provided the Patent Office history of the patent is ignored. Even, then, the meaning which the complainant would give to the claim is not the obvious or more natural import of its language. But the Patent Office file wrapper has been put in evidence. It shows that the original application for this patent contained a claim numbered 2. This claim read:

"In an electric-elevator system, a motor-reversing switch, comprising supply-circuit terminals and contact-blades; armature-circuit-terminals; and armature-circuit contact-blades adapted to contact with said armature-circuit terminals and arranged to remain in contact therewith when the supply-circuit contact-blades have been moved to the stop position."

It was rejected by the Patent Office examiner. He said it was too broad in view of Cook, 597,265, January 11, 1897, Herdman, 603,849, May 10, 1898, and Shepard, 641,157, January 9, 1900. Each of these patents showed a switch in which the armature circuit remained closed when the supply circuit contact blades had been moved to the stop position. The patentee then canceled the original claim No. 2, and substituted therefor the following:

"The combination of a supply circuit; an armature circuit; a switch adapted to close and open said supply-circuit and reverse said armature-circuit, and arranged to leave said armature-circuit closed after opening the supply-circuit; a brake resistance circuit; and mechanical means arranged to automatically introduce said brake resistance circuit into the armature circuit after the supply circuit has been opened."

This amended claim was also rejected as fully anticipated by Shepard and Herdman.

The patentee then canceled the amended claim No. 2, and gave up the effort to get a claim which would cover a switch in which the supply circuit contact blades were not required to move past the stop position. In the defendant's devices alleged to infringe the supply circuit contact blades do not move past the stop position. It is true that the armature circuit remains closed until a period which in point of time is subsequent to the moment at which the contact blades of the supply circuit have moved to the stop position. But, in spite of this fact, I do not think that the complainant can now be heard to say that the first claim of the patent in suit is infringed by any device in which the contact blades do not move past the stop position. In so saying it is in effect asking that claim No. 1 shall now be given a meaning as broad as the original claim No. 2. This the law will not permit. A patentee who has originally sought broader claims which were rejected and who has acquiesced in such rejection cannot under the authorities be allowed to insist upon such a construction of the allowed claim as would cover what had been previously rejected. Corbin Cabinet Lock Co. v. Eagle Lock Co., 150 U. S. 40, 14 Sup. Ct. 28, 37 L. Ed. 989; Roemer v. Peddie, 132

U. S. 317, 10 Sup. Ct. 98, 33 L. Ed. 382. I am therefore of opinion that the defendants do not infringe claim 1 of patent 716,504.

The complainant says that the defendants infringe the eighth claim of the same patent. This claim reads as follows:

"In an electric-switch system for reversing motors that employ series coils, the combination of a supply or line circuit; a switch mechanism adapted to open both sides of said line-circuit; and an armature-circuit-reversing switch arranged to be connected to the line-circuit switch by means of the series coils, whereby when the line-circuit is open, both sides of the motor-circuit, together with the series coils, are entirely disconnected from the line-circuit."

I do not understand that the defendants deny that the language of this claim is broad enough to cover some of the devices made by them if it be read without reference either to the prior art or to the particular structure described in the specifications of the patent in suit. They assert, however, that its language cannot be given a broad construction because, if it were so construed, the claim would be a claim for a mere function and therefore invalid. Second. That, if it be not for a function, it must be limited to the device or combination substantially described in the specifications. Third. That the defendants' devices admittedly differ in some respects from the device described in the patent. In order to determine whether those differences are substantial or merely colorable, it is necessary to examine the state of the prior art and the proceedings in the Patent Office with relation to this particular patent. The defendants say that, if such examination be made, it will show that the differences between defendants' devices and that described in the patent in suit are of such a nature that there is no infringement. It may well be that against other persons than the defendants this claim would be held void because so broadly worded as to amount to a claim for a function, or because, otherwise understood, it covers combinations already old at the time of the application for the patent in suit. The defendants, however, cannot make such a defense. As against them the claim must be conclusively presumed to be valid, and it must further be presumed to cover a construction which the patentee at the time he made the application for his patent supposed to be useful.

Does the estoppel against the defendants go still further? The complainant says it does. The words of the claim do describe switches which the defendants make. That being so, the complainant says it is the end of the case. For so saying the complainant has high authority. In Siemans-Halske Electric Co. v. Duncan Electric Mfg. Co., 142 Fed. 157, 73 C. C. A. 375, Judge Baker delivered the unanimous opinion of the Circuit Court of Appeals for the Seventh Circuit, composed at the time of himself and Judges Grosscup and Seaman. In that case a vendor had been sued for the infringement of a patent sold by him. He contended that he was entitled to prove the prior art to limit the scope of the claims of that patent. He admitted that he could not show that either the patent or any of its claims were altogether invalid. Judge Baker said:

"Why one defense and not the other? They are of as like blood as brothers. One is somewhat larger than the other (sic) is all. Lack of novelty defeats the complainant's title to the whole of the property within the metes and

bounds of the claims. Limitation destroys his title to a part. * * * The grant to [the patentee] was the right to exclude the public from using the inventions described in the claims, subject to the right of the public to strike down, if they could, the claims in whole or in part. The defendants assert that all that the complainant acquired by the assignment was the franchise to exclude, which had been granted to [the patentee]. This may be taken as true so far as the rights of strangers are concerned. But [the patentee's] assignment, in fact and likewise by its very terms, was a conveyance, not only of the franchise to exclude strangers, but was also a conveyance of the inventions described in the claims. The right of [the patentee] to the inventions, if they were inventions, existed prior to, and continued independently of, the issuing of the patents. * * * If, in the face of his sale of the inventions described in the claims, as existent property into the possession of which he purported to induct his grantee, he be permitted to defeat his grantee's right of possession of the whole or a part on the strength of a prior title outstanding at the time of the grant, he would be put on the same footing as a stranger, and the estoppel by deed would again be reduced to nihility. * * * In our judgment the reason of the case leads to the conclusion that between contracting parties extraneous evidence is inadmissible if there is no ambiguity or uncertainty in the language of the description and claims, and that, if there is uncertainty, outside evidence is admissible only to make clear what the applicant meant to claim and the government to allow, and not for the purpose of showing, even in the slightest degree, that the applicant had no right to claim and that the government was improvident in allowing what was in fact claimed and allowed."

On the other hand, the defendants say that the true rule of law is that which has been laid down in a number of cases by the Circuit Court of Appeals for the Sixth Circuit. They rely particularly upon Noonan v. Chester Park Athletic Club Company, 99 Fed. 90, 39 C. C. A. 426. Judges Taft, Lurton, and Day sat in that case. One of them is now President of the United States and two of them are Justices of the Supreme Court. The opinion was delivered by the then Judge, now Mr. Justice, Lurton, who spoke for a unanimous court. He said:

"It seems to be well settled that the assignor of a patent is estopped from saying his patent is void for want of novelty or utility, or because anticipated by prior inventions. But this estoppel, for manifest reasons, does not prevent him from denying infringement. To determine such an issue, it is admissible to show the state of the art involved, that the court may see what the thing was which was assigned, and thus determine the primary or secondary character of the patent assigned, and the extent to which the doctrine of equivalents may be invoked against an infringer. The court will not assume against an assignor, and in favor of his assignee, anything more than that the invention presented a sufficient degree of utility and novelty to justify the issuance of the patent assigned, and will apply to the patent the same rule of construction, with this limitation, which would be applicable between the patentee and a stranger."

The case of Noonan v. Chester Park Athletic Club Co. was decided some years before the Siemans-Halske Case. It was considered by the Circuit Court of Appeals for the Seventh Circuit in the latter case, but the judges who composed that court found themselves unable to adopt its reasoning. Nevertheless, when the question was again re-examined by the Circuit Court of Appeals for the Sixth Circuit several years after the decision in Siemans-Halske Case, the court for the Sixth Circuit adhered to its former ruling. Again, it spoke through the mouth of Judge Lurton. Babcock & Wilcox Co. v. Toledo Boiler Works, 170 Fed. 85, 95 C. C. A. 363. Before

any of the decisions above referred to the Circuit Court of Appeals for the First Circuit had· taken the position subsequently adopted in the Sixth Circuit. Martin & Hill Cash Carrier Co. v. Martin, 67 Fed. 786, 14 C. C. ·A. 642. I do not find that the question has ever been passed upon by the Circuit Court of Appeals for this circuit.

There is nothing mysterious about the doctrine of estoppel. A man is estopped because in equity and good conscience he should not be allowed to say something, although that something may be true. Whether equity and good conscience require that he shall keep his mouth closed may and usually does in large part depend upon the special facts and circumstances. One who knew well the state of the art might sell a patent to one who knew nothing about it. In order to make the sale, he might read the claims to the buyer. He might comment on the breadth of their language. He might assert that he knew that they covered every possible machine by which the wished for result could be attained. Such a seller, I take it, when sued for the infringement of a patent he had sold, would not be permitted to set up the prior art for the purpose of showing that the patent was in fact a very narrow one; that it covered a limited class of machines only and that there were large classes of machines not covered by the patent which would accomplish substantially the same results. The circumstances under which a patent may be assigned may be quite different. An inventor may be in the employ of another. He may turn over his inventions to his employer. The employer may at his own expense prosecute applications for patents for such of these inventions as it may think valuable. When such employé subsequently changes his employment, there seems to be no reason why he should be any more estopped than any one else from showing that the patent he assigned, though valid, must be narrowly construed. The complainant says that there are special facts and circumstances in this case which should estop the defendants from limiting the claims sued on. The special facts and circumstances so alleged are two.

First. The making of the agreement of September 5, 1888, by which the defendant Whittingham agreed to assign to the Automatic Switch Company of Baltimore City all future inventions which he might make or which he might become interested in relating to electric switches. The present complainant is not the company with which Whittingham made the agreement of September, 1888. It is a new corporation to which has been assigned the property and rights of the company with which Whittingham made his agreement. It is unnecessary to inquire whether such a contract could be assigned without Whittingham's consent so as to bind him to the new company. This is not a suit for the specific performance of that contract. The agreement is brought into this case by Darrin's testimony that before he bought the stock in the Automatic Switch Company of Baltimore City Whittingham showed him the agreement of September, 1888, and that the existence of this agreement was one of the inducements which led him to buy that stock.

If I were satisfied that this conversation or anything like it had in fact taken place, I might feel that Whittingham ought to be subject to

the rule of law laid down in Siemans-Halske Electric Co. v. Duncan Electric Mfg. Co., 142 Fed. 157, 73 C. C. A. 375, whatever might be my views as to the applicability of that doctrine to cases in which the vendor had made no representations other than those necessarily involved in the assignment of his patent. No one has testified with reference to this agreement except Darrin and Whittingham. Whittingham denies that any such conversation was had   He says that from the time the agreement was executed in September, 1888, he never heard of it or saw it until it was produced in evidence in this case. The burden of showing that such a conversation took place is on the complainant.   Darrin admits that he felt justified in seeking to attach money he agreed to pay Whittingham for his stock, although one of the terms of the agreement of purchase was that all suits he had brought against Whittingham should be dismissed.   It further appears in the record that Darrin, after having sworn that the reason the business of the Automatic Switch Company was not profitable was due to Whittingham, was compelled to admit that he had in other litigation between himself and his wife sworn that it was his wife's demands for money that had brought himself and his company to the verge of bankruptcy, and that to supply her demands he had borrowed large sums of money from the Automatic Switch Company.

In view of these admissions, I do not feel justified in basing any decision upon his uncorroborated statement of representations made to him when the fact that such representations were so made is denied by the party alleged to have made them.

Second. Certain bulletins issued by the Automatic Switch Company of Baltimore City during the time Whittingham was connected with that company have been offered in evidence by the complainant. It is said, and not denied, that Whittingham assisted in their preparation.   I cannot, however, find anything in those bulletins which make more rigid the estoppel to which the defendants should be subject in this case.   I am therefore of the opinion that it is open to the defendants to assert that claim 8, being functional in form, must in any event be limited to the construction substantially identical with that shown in the patent in suit, and that, in order to determine whether the difference between the devices made by the defendants and the construction shown in the patent are substantial or colorable, resort may be had to evidence of the state of the prior art.

The complainant apparently admits that claim 8 must be limited to the particular construction shown in the patent in suit or to some construction substantially identical therewith.   In its brief filed in this cause it discusses claims 1 and 8 together, and assumes that 8 is not infringed unless 1 is.   I believe that such construction is the proper one to place upon this claim. This is especially true in view of the statement of the patent itself that the invention consists in certain electrical and mechanical features of construction, arrangements, and combinations of the parts in the patent fully described and claimed.   If this view be correct, the conclusion already reached that claim 1 is not infringed disposes of the contention that claim 8 is. In any event, claim 8 must be construed as limited by the prior state

of the art. So limited, it appears to me that the difference between the construction described in the patent and the devices made by the defendants are so substantial as to exempt the latter from the charge of infringement.

I will therefore sign a decree dissolving the preliminary injunction and dismissing the bill of complaint, with costs.