CROWN CORK & SEAL CO. OF BALTIMORE CITY v. CARPER AUTOMATIC BOTTLING MACH. CO. OF BALTIMORE CITY et al.

(District Court, D. Maryland. December 29, 1915.)

1. PATENTS ⬳129—SUIT FOR INFRINGEMENT AGAINST ASSIGNOR—ESTOPPEL.

A corporation formed for the purpose of manufacturing a device alleged to infringe patents granted to one of the incorporators, who was to own one-half the stock, and assigned by him to complainant, is bound by any estoppel which binds such patentee.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 182½–186; Dec. Dig. ⬳129.]

2. PATENTS ⬳328—VALIDITY AND INFRINGEMENT—BOTTLING MACHINES.

The Carper patents, No. 1,012,984 and No. 1,120,596, each for a bottling machine, as to claims 28, 29, 37, 38, 39, 42, and 57 of the former, and claims 6, 9, 10, and 24 of the latter, are not for combinations of definite mechanical elements, but combinations to attain a definite end of mechanical means, which might vary in form and construction, and are entitled to a fairly liberal construction. As so construed, *held* valid and infringed. Claim 1 of the second patent *held* not infringed.

In Equity. Suit by the Crown Cork & Seal Company of Baltimore City against the Carper Automatic Bottling Machine Company of Baltimore City and Albert A. Carper. On final hearing. Decree for complainant.

Crain & Hershey, of Baltimore, Md., and James Q. Rice, of New York City, for complainants.

William F. Hall, of Washington, D. C., for defendants.

ROSE, District Judge. The plaintiff owns United States letters patent No. 1,012,984, December 26, 1911, and No. 1,120,596, December 8, 1914, both of which were issued to it as assignee of the defendant Carper. It says the defendants have infringed the twenty-eighth, twenty-ninth, thirty-seventh, thirty-eighth, thirty-ninth, forty-second, and fifty-seventh claims of the earlier patent, and the first, sixth, ninth, tenth, and twenty-fourth of the later. In the amended bill, infringement of the twenty-second claim of No. 1,012,984 was alleged, but at the hearing the plaintiff withdrew that claim from consideration. Both the patents are for machines for bottling gaseous liquids under pressure.

For nearly ten years prior to the 31st of May, 1914, the defendant Carper was in the employ of the plaintiff, as an inventor and machine designer, at an annual salary of $5,000. By his contract it was provided that any inventions which he should make while in plaintiff's employ should be for its exclusive use. In the course of such employment he made the inventions for which the letters patent in suit were subsequently issued; applications for them being made in 1908 in the months of June and December, respectively. While the earlier patent was granted more than two years before he left the plaintiff's employ, the second was still pending in the Patent Office at that time, and was not issued until six months later. Both applications were

prosecuted by Messrs. Spear, Middleton, Donaldson & Spear, who had for many years been solicitors of patents for the plaintiff.

The defendant Carper says that after he left the plaintiff's employ he invented a new bottling machine. On the 28th of August, 1914, through Messrs. Spear, Middleton, Donaldson & Spear, he applied for a patent therefor. It is in substance the alleged infringing device. For a period of more than three months, from the 28th of August to the 8th of December, the same solicitors prosecuted the application for the second patent in suit, and also the patent for the alleged infringing device. Mr. Hall, who is now a member of that firm, appears in this case as counsel for the defendants.

Carper's actual service with the plaintiff ended on the 30th day of April, 1914, although he was paid until the 31st of May of that year. It appears he thought that he had, in substance at least, invented the machine now said to infringe, possibly as early as the latter part of May of 1914, certainly by the early part of June of that year. He at once brought the device to the attention of the plaintiff, who, however, showed no interest in it. He took up the matter with Messrs. Spear, Middleton, Donaldson & Spear, and in August told the president of the plaintiff that he was having his patent application prepared by those gentlemen. The plaintiff at once wrote the latter telling them that Carper had called its attention to some alleged improvement on machines, the previous patents on which he had assigned to it, and had told it that they were drawing his improved plans. The letter notified them that Carper was no longer associated with the plaintiff, and that any work that they did for him should be done with knowledge of that fact. They replied that Carper had told them that he was no longer in the plaintiff's employ. They said they were impressed with the fact that it would be to the interest of the plaintiff to encourage him to deal with it. While they had told him that his new construction fell within the claims of the plaintiff's patent, there were radical changes in his device, and another concern might feel justified in patenting the invention and fighting out with the plaintiff the question of infringement. They added that a rival, with skillful attorneys having a knowledge of the prior art, when aided by Mr. Carper, would not lack grounds on which to base a defense. A reference was also made to the pending interference of one Shields, and it was suggested that Carper's invention would avoid the issue upon which such interference was declared.

[1] Plaintiff did not accept these suggestions. Carper thereupon sought other backing, and obtained it from one Henry L. Brack. On the 30th of September, 1914, an agreement was entered into by them and a certain Charles H. Brack. The last named had been an employé of the plaintiff and had left its service shortly after Carper. This agreement provided for the formation of the corporate defendant, the Carper Automatic Bottling Machine Company of Baltimore City. The latter was to have a capital of $500, divided into 100 shares of the par value of $5 each. Henry L. Brack agreed to loan the company the sum of $10,000, the loan to be made in such installments as the board of directors might from time to time determine. The

company was to pay him 6 per cent. interest on such loan. Henry L. Brack agreed that, after the patents Carper was to obtain for the machine had been assigned to the company, he would make over 50 shares of its stock to Carper and 23 shares to Charles H. Brack. There were other provisions for the division of profits, when there were profits to divide. In the meanwhile, Carper was to receive a weekly salary of $50. At the time of the hearing, Henry L. Brack had lent the company $5,000 of the $10,000 mentioned in the agreement. In view of all the circumstances, the corporate defendant is bound by any estoppel which binds Carper. Automatic Switch Co. v. Monitor Manufacturing Co. (C. C.) 180 Fed. 986, and cases there cited.

The substantial defenses divide themselves into two classes: First, that none of the claims in suit can be read upon the defendants' device; second, that, even if the first contention should not be sustained, the prior art requires the broad language of these claims to be limited by construction, and that, when so limited, defendants do not infringe. Of these defenses in their order.

One of the elements in all of the claims in suit is a filling chamber. Defendants say that their device contains none. When a bottle is being filled with gaseous liquids, which are to be sealed in it under pressure, communication between its mouth and the open air must be cut off. Some place provided with facilities for cutting off such communication must be supplied, and while the bottle is being filled its mouth must be brought into such place, or in air-tight connection with it. In machines having the purpose of those involved in this controversy, such place is usually known as a filling chamber; that is to say, the chamber in which the bottle mouth is held while being filled. In that sense of the word, the defendants' machine, as well as those of the plaintiff, necessarily has such a chamber. Defendants say, nevertheless, that they have not a filling chamber, as that term is used in the patents in suit, because in their device the liquid is carried in a tube through the chamber into the bottle, while in plaintiff's machine the liquids enter the chamber and from it flow into the bottle.

In defendants' contention the real function of the filling chamber is lost sight of. It is not primarily a chamber through or from which the liquid is to be carried into the bottle, although such carrying, in one way or another, must necessarily take place; but it is a chamber in which the bottle mouth is to be secured in some gas-tight manner while the bottle is being filled. There is nothing in any of the claims in suit to suggest that this natural and simple interpretation is not the one intended. When the tube stops an eighth or a sixteenth of an inch above the bottle head, defendants admit that there is a filling chamber. It is mere trifling to assume that the lengthening of that tube by half an inch would enable the defendants to escape infringement. The function performed by the tube does not depend on its length. It is true that there may be advantages in using a longer tube, having at its lower end means of breaking the force with which the liquid is discharged from it. Defendants contend that there are. If they are right, the discovery of this fact and the providing of apparatus necessary to make practical use of it may involve the exercise

of inventive genius. In that event, defendants may be entitled to a patent for such improvement.

Such circumstances have nothing to do with the question as to whether their device does not contain a filling chamber. The function of that chamber is precisely the same, whether the liquid is brought from the outer air to the bottle through a tube or opening which stops in the top or side of the chamber itself, or extends nearly or quite to the bottom of the air, which by the filling chamber and the bottle is cut off from communication with the atmosphere. At the time the individual defendant applied for the second patent in suit, he stated that, when the bottle head and gasket are in gas-tight contact, the situation existing was as if the interior of the bottle were a part of the filling chamber, and in his application for a patent for the device now alleged to infringe, he said that in his machine "various means may be employed for delivering the liquid into the bottle."

An element of the combination described in some of the claims in suit, in addition to the filling chamber, is a means of supplying liquids thereto. The filling chamber, at the time the bottle is being filled and sealed, must be cut off from free communication with the air, and yet in a bottling machine there must be means for conveying liquids to this filling chamber while it is so cut off. The "means for supplying liquids thereto," referred to in the patent, are the means which serve such purpose, and it is immaterial, when the liquid has been so supplied, whether it is discharged above or below the bottle mouth. It follows that the defendants' first contention cannot be sustained.

Defendants' second contention, that the broad language of the claims in suit must, in view of the prior art, be limited, and that, when so limited, their device does not infringe, must now be considered.

The patents in suit are for combinations. They are for making a new thing by putting old things together in a different way from that which has been before used. In one sense, all machine patents are for new combinations of old things. Pulleys and levers, wheels and screws, as well as the materials out of which they are made, are millenniums old. An inventor may conceivably take nothing newer than some of these fundamental mechanical devices, which were known as soon as men acquired any civilization whatever, and he may so combine them as to produce some machine, all or nearly all of the subsidiary combinations in which are new. Another man may use as the elements of his combination devices which in themselves are highly organized machines, and if he so combines them, as distinguished from merely putting them together, that they will produce a new result, or an old result in a new and better way, he too has made an invention.

Now the patents in suit and the alleged infringing device are alike, in that they are all combinations of the latter class. Carper testified that when making his first invention he had before him all the patents that had, to that time, been issued for bottling machines, as well as a number of machines themselves, some patented and one at least unpatented, which had been made for use, and some of which had been extensively used. It is clear that his purpose was to make a new machine which would be absolutely automatic in its operation, and in which the

devices for accomplishing each of the different stages of the process should be so accurately timed that the machine would work with speed and efficiency. Such a machine would be a step forward in the art. How long a step would depend upon the degree to which he obtained his end and the extent to which, in consequence, the cost of an efficient bottling operation was thereby reduced. The language of the description in the two Carper patents in suit shows that for the performance of different parts of the bottling operation there were various well-recognized methods then in existence, and that his invention, as he saw it, laid not in the selection of one or the other of these methods of doing each one of the things that was necessary or desirable to do, but in his way of combining all these operations so as to accomplish one unified result.

Now, it is true that the way these separate operations must be combined might depend to a very considerable degree upon the method actually selected for performing each of them, and, if so, one of such methods might not, for the purpose of his invention, be an equivalent of the others, but to the extent to which his combination as an operative device did not necessarily depend upon the details of the machinery employed in one or another part of the work, he could claim as his invention the bringing together, so as to produce from the various operations one unified result, whatever old or new machinery might be used in the various steps of such operations. Such was unquestionably Carper's view when he applied for the two patents in suit. More than a score of times in each of his applications did he say that the means for doing various things which had to be done might vary within wide limits. In each of these patents, he was, moreover, at pains to point out that his invention, as he understood it, consisted in making a working combination of various mechanical operations, every one or nearly every one of which had in the past been performed in various ways, and for the doing of which in his new combination an equal variety of means might be employed.

Nor when, after he had left the plaintiff's service, he applied for a patent for the device now said to infringe, did he show any different conception of the nature of the task to which he had addressed himself. Some ten times in the course of that application he declared that various means for doing some one or another of the things required to be done in his combination might be employed. It is true, as defendants aver, that the plaintiff and Carper were equally well informed as to the state of the art. It follows, defendants contend, that they are not, for the purpose of limiting the language used in the claims, estopped from showing what that state was. The specifications and claims of the patents in suit were drawn by solicitors chosen and paid by the plaintiff. He was himself in plaintiff's employ. Under such circumstances the court might hesitate long before basing an estoppel on some isolated phrase, or even upon a number of ambiguous sentences, in specifications or claims. That is not the point here in issue. A different question is presented. It is in what the invention itself consists; that is, whether it lies in the combination, for the purpose of producing a common result, of particular, definite, and, except within very narrow

limits, unchangeable mechanical constructions, as defendants contend, or whether, as plaintiff asserts, it is found in the combination of various operations to bring about the desired end, there being a considerable choice among a number of well-known ways of performing each of such operations, as the inventor himself, at the time in the most formal way told the Patent Office.

To the latter view Carper thus committed himself. His counsel, who now so earnestly and persistently argue for the latter, once gave the weight of their experience, learning and ability to the former. It may be that neither of them are now estopped to say that what he, acting under their advice, swore to be true, was in fact untrue. Nevertheless, before at their insistence, and for his profit, he can be held mistakenly to have told the Patent Office, under oath, that his invention was in substance of a different kind than it actually was, it should be clear that either the state of the art or some settled principle of law makes it impossible to accept the view of his invention so often and so solemnly expressed by him. There is nothing in the record nor in the authorities to which attention has been called to make either clear. If it were otherwise, the defendants would be no better off. When there is room for doubt as to what a patentee means, the courts strive so to construe his language as to save his claims; but in this case, if words mean anything, there can be no question that Carper said his invention consisted, not in a combination of definite mechanical structure, but in the combination to attain a definite end, of mechanical means, most of which might vary widely in form and construction. If the state of the art showed that he was not entitled to claim such an invention, his patent would be held invalid. It would not be a case in which the claims were broader than the invention, but it would be one in which the invention described and claimed was in essentials different from anything which the patentee had actually invented.

But the defendants are estopped to deny that each and every one of the claims is valid, however free they may be to limit the scope of such claims in any case in which anybody else could properly ask for such limitation. As the record is here presented, it is not necessary for the plaintiff to invoke the benefit of the doctrine of estoppel. The grant of the patent for the invention described and claimed, of course, creates the presumption of its novelty and utility. There is nothing here to overcome that presumption. It is perhaps somewhat strengthened by the fact that plaintiff has received a half a million or more for machines made in accordance with the disclosures of these patents.

Assuming, as has already been held, that defendants' machine has a filling chamber and means for supplying liquids thereto, each of the claims in suit in the first patent are readable upon defendants' device. Most of the arguments on behalf of the defendants, why such claims should be so limited by construction as to make it impossible to read them upon their machine, are based upon the contention that the invention of the patent in suit was merely a combination of definite mechanical constructions. That contention has already been rejected. In the view that has been taken, viz. that the invention claimed was

for the combination in one unified machine, all the parts of which work together to produce one definite result, of means for performing various operations, most if not all of which were well known, and most of which, to the knowledge of those skilled in the art, could, as the patentee says, be performed in more than one way, there is nothing in the prior art as disclosed in this record which requires that the claims in suit should in favor of these defendants be so narrowed that they will not cover defendants' machine.

A like conclusion can be reached as to all the claims of the second patent in suit, except the first. The machine of the second patent in suit is substantially that of the first, except as to the arrangements for allowing, during the filling of the bottle, the escape of surplus air and gas from the filling chamber. In the machine of the first patent, at the time the liquid begins to enter the bottle, the filling chamber is closed to the escape of air and gas. The volume of air within the bottle is greater than that of the air in the filling chamber above the bottle mouth, and consequently, as the liquid under gaseous pressure comes into the bottle, the air in the bottle and the filling chamber, for it is impossible for such purpose to distinguish one from the other, becomes compressed and in such condition exerts a resistance to the flow of further liquid into the filling chamber and the bottle. The effect of this resistance is first to retard the filling, and ultimately to arrest it all together. To deal with this situation bottlers have long employed what they call a "snifting process"; that is to say, they provide means by which a valve can be opened during the filling of the bottle to allow the escape of air and gas. Usually this snifting process takes place when the pressure in the filling chamber has become high; that is, when the bottle is nearly filled. When the valve is then opened, the filling is necessarily finally completed and the bottle sealed at a time when, in consequence of the escape of air and gas through the snifting valve, or other outlet, the pressure upon the contents of the bottle has been reduced considerably below that in the carbonator. The result is to waste a good deal of the gas that has been, with trouble and expense, there forced into the liquid.

The invention of the second patent was intended, in combinations of the kind described and claimed in the first patent, to provide means for overcoming this difficulty. This end was attained by providing means for the partial escape of gas from the beginning of the filling process until nearly its close, and then for cutting off such escape. The effect necessarily was that, at the time the bottle was sealed, the liquids in it were under high pressure. To accomplish this purpose, Carper in his second patent arranged or invented a snifting tube which could be let down into the bottle, and which should be open from the time at which the flow of liquid into the bottle began. This tube and the openings into it were so arranged as to keep the pressure in the bottle and filling chamber at that point most conducive both to filling the bottle with the greatest rapidity and to preventing any undesirable escape of gas. By ingenious mechanism, when the bottle was filled to a certain predetermined point, this venting tube was closed and drawn up out of the way of the filling chamber. There was then no

longer any way of escape for the gas. As a consequence, the process of filling and sealing the bottle was completed under a pressure at least equal to that prevailing in the carbonator.

Some of the claims of the patent are limited to the precise mechanism shown. Those in suit are broader and purport to cover other means for allowing the desired escape of gas during most of the filling process, and of closing the avenue for such escape shortly before the bottle is sealed. As in the first patent, the patentee left no possible doubt that the invention claimed in these broader claims was the combination, with the machines of the prior art, of any mechanical means included within the language of those claims, and adapted to attain the contemplated result. Such claims may or may not be invalid as against any one entitled to set up such invalidity, as these defendants are not; but there can be no question as to what they mean and were intended to cover.

One of the elements of the first claim of the second patent in suit is for automatic means for enabling the gas to escape continuously until the filling operation has been nearly completed. In the alleged infringing device means are provided by which the gas does escape during most of the process of filling, and the escape is cut off just before the filling is completed and the bottle sealed. The means for bringing about these results are somewhat different from those shown in the patent in suit. There is no venting tube, but there is a valve which is controlled in such manner that it opens an instant after the filling begins. It is finally closed just before or as the filling ends. If that were all, it would clearly answer the description of the like element in the first claim of the second patent in suit; but it is not quite all. The method of control used for this valve is such that, shortly after it is first opened, it is closed for a brief period of time, and then reopened. The time is very short. The only witness who attempts to testify on the question estimates that the period during which it is closed is about one-tenth of the time consumed, in filling a bottle, and as the machine will fill, according to the testimony, 1,200 bottles an hour, it will be seen that this closing and opening must be of the briefest.

Plaintiff's contention is that the closing is made for the sole purpose of evading the claims in suit; that it has no other end or function, and is for so brief a period that, as a practical matter, it does not interrupt the continuity of the venting. Defendants assert that they had a distinct purpose in view in arranging for this temporary closing. In the alleged infringing device the syrup is not introduced simultaneously with the charged water, as in the machines described in the patents in suit, but is put in the bottle before the latter comes to the filling chamber. The defendants say that this temporary closing is intended, in the early stages of the filling of the bottle, to keep down the foaming of the syrup when mixed with the gas-charged water. Such foaming is one of the undesirable things with which bottlers have to contend. It is likely to result in a certain amount of the syrup being carried off through the venting valve. They claim that the brief closing of their venting valve and some other differences in the construc-

tion of their machine reduce to an appreciable extent the waste of syrup, which they charge takes place in that of the plaintiff.

With some hesitation the conclusion has been reached that, upon the record as it stands, it would not be proper to hold that defendants' device infringes the first claim of the second patent in suit. Such holding is made solely because of the use in this claim of the word "continuously." That word is not found in the other claims in suit.

The latter are accordingly, upon the evidence, held valid, and infringed by defendants' device. It follows that the plaintiff is entitled to the usual decree declaring valid all the claims in suit, and that the defendants have infringed all of them except the first claim of patent No. 1,120,596, which they have not infringed.

As, at the time the preliminary injunction was granted, an agreement as to the amount of damages suffered by plaintiff in consequence of the infringement was reached and entered of record, an accounting will not be necessary; but the decree for an injunction may also require the payment of such sum by the defendants to the plaintiff.