SCHIEBEL TOY & NOVELTY CO. v. CLARK (three cases).

(Circuit Court of Appeals, Sixth Circuit. October 16, 1914.)

Nos. 2443–2445.

1. PATENTS (§§ 129, 202*)—SUIT FOR INFRINGEMENT—TITLE TO SUPPORT—DEFENSES.

Where receivers appointed in a suit for dissolution of a partnership sold the assets of the firm, including patents, and by direction of the court assigned the same to the purchaser, which assignment was recorded, the partner who instituted the suit, and at whose instance the

sale was made, when sued for infringement of one of the patents, cannot deny the title of the purchaser; nor can he deny the validity of the patent, although he may deny infringement, and in aid of such defense invoke the prior art.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 182½–186, 281–289; Dec. Dig. §§ 129, 202.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—LOCOMOTIVE TOY.

The Clark patent, No. 676,420, for a friction-driven locomotive toy, which is an improvement on the device of a prior patent, discloses invention, and while, in view of the prior art, and especially of such patent, it is entitled to only a limited range of equivalents, it is not restricted to the specific form preferred in the specification; also *held* infringed.

3. PATENTS (§ 165*)—INFRINGEMENT—CONSTRUCTION OF CLAIMS.

The rule which ordinarily confines a patentee to the language he has used in stating his claims is not so hard and fast as to permit appropriation by another of the essence of his invention, merely because he has employed fit words to apply his invention to an earlier one, upon which it is an improvement.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 241; Dec. Dig. § 165.*]

4. PATENTS (§ 328*)—VALIDITY—LOCOMOTIVE TOYS—PRIOR USE.

The Turner patents, No. 930,107, for a racer automobile toy, and No. 930,633, for an engine locomotive toy, *held* void for prior public use and sale of the devices more than two years before the applications were filed, with the consent of the patentee.

5. COURTS (§ 300*)—FEDERAL COURTS—INCIDENTAL JURISDICTION—INFRINGEMENT SUITS.

Where, in a suit for infringement, the patents in suit are adjudged void, and the parties are both citizens of the same state, the court is without jurisdiction to determine a cause of action alleged for unfair competition.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 847, 850; Dec. Dig. § 300.*

Jurisdiction of federal courts in suits relating to patents, see note to Bailey v. Mosher, 11 C. C. A. 313.]

6. PATENTS (§ 26*)—"INVENTION"—COMBINATION.

"Invention" may consist of old elements so combined as to co-operate and produce a new and useful result.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig. § 26.*

For other definitions, see Words and Phrases, First and Second Series, Invention.]

Appeals from the Circuit Court of the United States for the Western Division of the Southern District of Ohio; Howard C. Hollister, Judge.

Three suits in equity by the Schiebel Toy & Novelty Company against David P. Clark. Decrees for defendant, and complainant appeals. Reversed as to one case, and affirmed as to two cases.

Wm. R. Wood, of Cincinnati, Ohio, for appellant.

H. A. Toulmin and H. A. Toulmin, Jr., both of Dayton, Ohio, for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. These three suits were for alleged infringements of particular letters patent, and, in addition to the usual features of such cases, issues growing out of the dissolution of a copartnership and sale of its assets, also concerning alleged unfair competition, were involved. As far as necessary, these issues will be noticed as we progress. The patents in suit relate to improvements in toys of the type known as locomotive toys.

The first suit involved letters patent No. 676,420, dated June 18, 1901, and issued to the appellee, Clark. The patent covers a friction-driven device designed for the operation of toys in the forms of locomotives, automobiles, and the like.

The infringement complained of in the second suit concerns letters patent No. 930,107, issued August 3, 1909, in the name of John C. Turner, assignor, to the plaintiff. The invention was designed to provide a toy "preferably representing a racer automobile, in which the body is struck up from a single blank."

The third suit charged infringement of letters patent No. 930,633, issued August 10, 1909, in the name of John C. Turner, assignor, to the plaintiff; and the patent was intended for "an engine locomotive toy wherein the boiler, cab side walls, fire box side walls, and boiler support are struck up from a single sheet of metal and bent into shape."

The devices in issue in these last two suits were designed as bodies, automobile and locomotive, for the friction-driven device involved in the first suit. The suits were all between the same parties, were tried together, and passed upon in one opinion below. The decree in the first suit was based upon noninfringement, and in each of the other suits upon invalidity of the patent in issue. The appeals were argued and submitted as one cause here, and will be disposed of in this opinion.

[1] 1. *The Clark Patent in Suit.* It is contended that plaintiff has no title to the Clark patent and cannot maintain suit upon it for that reason; also that Clark may contest its validity. D. P. Clark & Co. in name, with some changes in membership, was engaged as a copartnership in the toy business at Dayton, Ohio, from 1897 to 1909. In February, 1904, D. P. Clark and William E. Schiebel became equally and solely interested in the firm, and continued the business under the old name until dissolution, which will be explained later. Clark and Schiebel each secured letters patent upon certain devices designed by them respectively; and they entered into an oral agreement, and carried it out in part, to transfer their patents to the firm. On May 18, 1904, Clark transferred to the firm a number of his patents— including the patent now under consideration, No. 676,420—and this transfer was two days later recorded in the Patent Office.

Differences arose between the partners, and in December, 1908, Clark commenced a suit against Schiebel in the common pleas court of Montgomery county, Ohio, for the dissolution of the partnership and sale of its assets. He alleged that the company was engaged in a large and profitable business in the manufacture and sale of novelties and toys;

that it possessed "a number of copyrights and patents issued to it by the United States," a valuable good will, and assets of about $75,000 above its liabilities; that the assets were of "far greater value when taken together than if separated," and should be sold as an entirety, and the proceeds divided between the partners. The prayer was that the partnership "be adjudged dissolved, and a receiver of the property and good will be appointed, with power to dispose of the same." Clark made and signed the required verification to the petition. Two receivers were appointed; and, under orders of the court, the firm assets, which included the patents, good will, and the right to use the firm name, were sold to plaintiff in the instant suits as the successful bidder. The sale was confirmed, and the receivers were ordered among other things to assign the patents to the purchaser, and "to do and perform all other acts and things necessary and proper to convey and transfer to and vest in said purchaser all the property, assets, and interests so sold." On March 26, 1909, the receivers executed and delivered a written transfer to the plaintiff, embracing the letters patent now in question, No. 676,420; and this transfer was recorded in the Patent Office April 1, 1909.

It is claimed that the legal title to the patent then stood in the name of D. P. Clark & Co.; but we need not pass upon this claim, for, conceding it, and also that under section 4898, U. S. Rev. Stat. (Comp. St. 1913, § 9444), the formal course in the state court would have been to have the firm join in the execution of the transfer (Ball v. Coker [C. C.] 168 Fed. 304, and citations), still the insistence would be unavailing. In disposing of the suit to dissolve the firm and wind up its business, the state court was in the exercise of its chancery powers and jurisdiction, and the members of the firm could have been compelled to execute a formal assignment, either themselves, or, in default, by some suitable person appointed by the court. Ager v. Murray, 105 U. S. 126, 127, 132, 26 L. Ed. 942. Moreover, the sale was voluntary, not involuntary. Schiebel is president of the plaintiff company, and is not questioning the receivers' transfer of the patent. As we have seen, these receivers were the official instrumentality sought by Clark for disposing of the firm assets; and Clark received and now enjoys the benefits of his full share of the sale proceeds. It results that at least the equitable title to the patent passed to plaintiff; and Clark's reliance upon an outstanding naked legal title is in effect a claim that he may have the benefits of both the patent and the money he received for it. This cannot be assented to, and, for the purposes of this suit, he will not be heard to deny plaintiff's title.

It follows that Clark is estopped from denying the *validity* of the patent, either for lack of novelty or utility, or by reason of anticipation through prior inventions; but this does not prevent him from denying infringement. Noonan v. Chester Park Athletic Club Co., 99 Fed. 90, 91, 39 C. C. A. 426 (C. C. A., 6th Cir.); Babcock & Wilcox Co. v. Toledo Boiler Works, 170 Fed. 81, 84, 95 C. C. A. 363 (C. C. A., 6th Cir.); Fishel-Nessler Co. v. Fishel & Co., 204 Fed. 790, 791 (C. C. A., 2d Cir.). In aid of the denial of infringement, Clark may invoke the prior art (Noonan v. Chester Park Athletic Club Co.,

supra; Leather Grille & Drapery Co. v. Christopherson, 182 Fed. 817, 822, 105 C. C. A. 249 [C. C. A. 9th Cir.]); for the effect of this is simply to define the thing sold, and so to ascertain definitely whether it has been infringed or not. As the late Mr. Justice Lurton said in the Noonan Case, 99 Fed. 91, 39 C. C. A. 426, respecting the admissibility of the state of the art involved, it enables the court to see—

"* * * what the thing was which was assigned, and thus determine the primary or secondary character of the patent assigned, and the extent to which the doctrine of equivalents may be invoked against an infringer. The court will not assume against an assignor, and in favor of his assignee, anything more than that the invention presented a sufficient degree of utility and novelty to justify the issuance of the patent assigned, and will apply to the patent the same rule of construction, with this limitation, which would be applicable between the patentee and a stranger."

And this court again had occasion to declare the rule in United States Frumentum Co. v. Lauhoff, 216 Fed. 610, 132 C. C. A. 614, decided June 30, 1914; Judge Denison saying:

"While a patentee assignor may, when made a defendant, litigate the scope of his patent and have it judicially construed according to its true extent (Noonan v. Chester Co. [C. C. A., 6th Cir.] 99 Fed. 91, 39 C. C. A. 426; Smith v. Ridgeley, 103 Fed. 875, 43 C. C. A. 367 [C. C. A., 6th Cir.]), the courts * * * will not, in a doubtful case, construe it so narrowly as to make it worthless. * * * They will be inclined, so far as the record permits, to make its exclusive right a real and valuable thing. Alvin Co. v. Scharling (C. C.) 100 Fed. 87."

[2] What, then, is the Clark patent in suit, and is it infringed? It is a combination patent, and purports to be "in the general nature of an improvement upon the structure set forth in letters patent No. 593,-174, granted November 2, 1897, to Clark & Boyer, as assignees of Israel D. Boyer and Edith E. L. Boyer," and called in this litigation the Boyer patent; and this reference will be found helpful in distinguishing between old and new elements of the patent in suit. The Clark structure, as described in the specification and drawings, consists of a truck frame, composed of side members having preferably an arched form and joined at their ends by transverse members, mounted between two sets of running wheels with parallel axles; and as thus far described is similar in appearance to a miniature open road wagon, except that all the running-wheels are of the same diameter and the fore and aft sets are brought into close proximity at their rims. The axles pass through slots extending from the bottom, at points near the ends, of each side member of the truck frame; and when this frame is lifted, the axles of the running-wheels are held within the slots by a wire frame which passes under each axle and extends over the end bars of the truck frame. The slots are of such depth as to prevent contact between their upper ends and the axles, and the outer side walls of the slots incline toward each other. Mounted in the angles formed by the rims of the two sets of running-wheels is a floating axle carrying an inertia-wheel midway of its length. The ends of this axle impinge on the running-wheels at a very acute angle; "its line of movement" in the language of the specification "being parallel to a tangent to said wheels." At the center, and on the inner surface of each side member of the truck frame, an anti-friction roller

is so maintained as to present a rolling contact with the upper surface of the floating axle. It is to be observed (though it is not distinctly provided for in the specification) that the floating axle necessarily and in practice passes through ample openings made in the side members of the truck frame immediately under such anti-friction rollers. Thus the weight of the truck frame is removed from the axles of the running-wheels, is carried by the floating axle, and the frictional resistance to the rotating movement of the axles of the running-wheels is materially reduced; and, besides, the combined weights of the truck frame, the inertia-wheel, and its axle, press upon the peripheries of the running-wheels. Stated otherwise, and in language of the specification, the floating axle is supported at each end on "a three-point bearing composed of the running-wheels and the anti-friction rollers on the truck frame," and so has only "rolling contacts." Further, the specification states:

"Owing to the inclination of the outer walls of the slots in which the running-wheel axles are mounted downward pressure applied to the truck frame will cause the running-wheel axles to be moved toward each other and press more firmly against the inertia-wheel axle," which results in "a biting action" and "still further enhances the effectiveness of the contact between the parts."

After stating that the truck frame may serve as a support for any suitable vehicle body, the specification proceeds:

"The toy is operated by placing it upon a suitable surface and moving it over the same while pressure is applied to the truck frame. In this manner motion is imparted from the running-wheels to the inertia-wheel, and when the pressure is removed and the toy released the inertia-wheel will in turn impart movement to the running-wheels and cause the toy to move over the surface on which it is placed."

And the results attained are stated to be a "much longer operative period and a higher initial speed when the toy is released for automatic operation." While not limiting himself to the "precise details of construction" so described, but stating that "it is obvious that they may be modified without departing from the principle" of his invention, the patentee makes three claims, which appear in the margin.[1]

It is important now to give some consideration to the state of the

[1] "1. In a locomotive toy, the combination, with two pairs of running-wheels having parallel axles, of a truck frame vertically movable relatively thereto, and provided with bearing-rollers, and an inertia-wheel having a floating axle, said axle having a three-point bearing at each end between the running-wheels and the truck-frame rollers, the weight of the truck frame being supported on said inertia-wheel axle, substantially as described.

"2. In a locomotive toy, the combination, with two pairs of running-wheels having parallel axles, of a truck frame having slots, the bearing-walls of which are inclined to force the truck-wheels laterally toward the inertia-wheel axle when the truck frame is depressed, and an inertia-wheel having an axle bearing upon the peripheries of the running-wheels, substantially as described.

"3. In a locomotive toy, the combination, with two pairs of running-wheels having parallel axles, of a truck frame vertically movable relatively thereto and having bearing-rollers and slots, the bearing-walls of which are inclined to force the truck-wheels toward each other, and an inertia-wheel provided with a floating axle bearing at its ends between the peripheries of the running-wheels and the truck-frame rollers, the weight of the truck frame being supported on said axle by said rollers, substantially as described."

art at the time of the issue of this patent. We have seen that the patent purports to be an improvement upon the structure set forth in the Boyer patent. While Israel D. Boyer and Edith E. L. Boyer appear to have been the inventors, neither of them was a member of the firm of Clark & Boyer at the time the patent was assigned and issued to the firm. The firm was dissolved by the death of Boyer in 1899, and Clark assigned the Boyer patent to D. P. Clark & Co. on May 18, 1904. It is hardly necessary to say, however, that Clark's interest in the Boyer patent at the date of the issue to him of the patent in suit (June 18, 1901) did not entitle him to include in his patent the invention embraced in the prior Boyer patent. Indeed, this would not have been admissible if he had been the inventor of both patents, and so the Clark patent in suit may be read in the light of the Boyer patent precisely as if the latter had been issued to a stranger.. James v. Campbell, 104 U. S. 356, 382, 26 L. Ed. 786; Celluloid Manufg. Co. v. Cellonite Manufg. Co. (C. C.) 42 Fed. 900, 905, 906. The structure covered by the Boyer patent is thus described in its specification:

"It consists of a four-wheeled truck and a heavy inertia-wheel, the latter being fixed to a shaft which has its sole bearings on the peripheries of the four running-wheels of the truck, so that any motion imparted to the inertia-wheel will be transmitted through its shaft to the four running-wheels of the truck, causing the truck to move over the floor, or vice versa, any motion given to the truck will be transmitted through its four running-wheels to the shaft of the inertia-wheel."

It is true that, in the preferred form of truck there described, the wheels of one of the axles were placed closer together than those of the other, so that the two pairs of wheels would slightly overlap when mounted in the frame; but, as the specification states, this is not necessary, "for if the shaft of the inertia-wheel be large enough in diameter the adjacent wheels may lie in the same plane." It is also true that in the preferred form motion is imparted to the shaft of the inertia-wheel by a removable top in one or the other of two defined forms, which is set in motion by a string and used as a motor; but the suggestion of a substitute for either of these devices is seen in a method pointed out for recharging the motor, namely, "by pushing or pulling the truck over the floor—the motion of the running-wheels imparting velocity to the motor." And claims 5 and 6 are shown in the margin.[2] It thus becomes evident that the purpose of the Clark

[2] "5. In a locomotive toy, four running-wheels arranged in two pairs near together and in such manner that the adjacent wheels form an angle in which a shaft may lie; an inertia-wheel fixed to a shaft, said shaft lying in the angle formed by the adjacent pairs of running-wheels; the whole in combination and arranged to operate substantially in the manner and for the purpose specified.

"6. A locomotive toy consisting of a vehicle having four running-wheels arranged in two pairs near together and in such manner that the adjacent wheels form an angle in which a shaft may lie; an inertia-wheel fixed to a shaft and independent of the vehicle; on the shaft of the inertia-wheel a handle loosely mounted to enable the wheel to be held in the hand while velocity is imparted thereto and also to enable the live wheel to be placed upon the vehicle with its shaft resting in the angle formed by the four running-wheels, the inertia-wheel then acting as a motor and causing the vehicle to move ahead substantially as specified."

improvement was to reduce the frictional resistance encountered in the operative parts of the Boyer patent. Clark did this by the introduction of slots designed for the axles of the running-wheels and the employment of anti-friction rollers as bearings for the axle of the inertia-wheel. These contrivances operated at once to transpose the weight of the truck from the axles of the running-wheels to the axle of the inertia-wheel and to place the latter axle entirely within rolling contacts. The advance so made in the state of the art as it was disclosed by the Boyer patent is seen, and cannot fail of appreciation, when it is considered that Clark admittedly succeeded in selecting and combining means which were calculated in marked degree to diminish existing mechanical interference with the operation of friction-driven devices.

The scope of the Clark improvement is nevertheless affected by the facts that slots designed to control or give free action to axles of running-wheels, and that anti-friction rollers, were not new at the time he applied for his patent. Slots are shown in the drawings and described in the specification of Trueman's English patent of July 13, 1889:

"e, e, are the second or traveling wheels, and f is the axle of the same, which we mount in slotted or loose bearings g in the frame or sides d of the carriage, so that the axle f can move nearer to or farther from the axle b of the fly wheel."

And, as pointed out by defendant's expert when describing the prior art, a number of exhibits consisting of foreign-made toys show axles of traction wheels rotating in vertically slotted bearings, though they do not seem to have been designed, as here, to avoid friction. It is true that these foreign-made toys are much less in size and weight than those made under the patent in suit; but, as these foreign and domestic devices all belong to the toy art, it is too clear for argument that the designer of the larger toys could not shut his eyes to the facts disclosed by the older and smaller objects of the same art. And, as to Clark's anti-friction rollers, they find mechanical analogy in earlier devices. This is not disputed as far as anti-friction bearings are concerned. However, it is disputed that such bearings have been applied to "an inertia-wheel axle mounted on anti-friction bearings"; and in support of this complainant's expert criticises three patents referred to by defendant's expert, viz.: Farley, No. 216,165 (issued June 3, 1879); Anderson, No. 228,720 (issued June 15, 1880); and Burton, No. 487,236 (issued November 29, 1892). The criticism is:

"The axle f of Farley, the axle A of Anderson, and the axle 15 of Burton is in each instance the axle of an ordinary flanged car wheel. To follow the teachings of these patents would simply lead to the application of anti-friction rollers at the axle of the traction wheels of a toy. This is not done by either party to the suit."

It is observable that this concedes the prior invention and use of such rollers with respect to axles of ordinary car wheels; and we may safely add that the use of anti-friction bearings in one form or other,

including rolling contacts, was a matter of common knowledge prior to the date of the patent in suit.

Much is said in argument concerning the novelty of the three-point bearing at each end of the floating axle, between the running-wheels and the truck-frame rollers. As we have seen, this is distinctly embraced in the combination set out in claim 1 of the patent in suit; and it is stated in the specification:

"It will also be noted that it results from the construction described that the inertia-wheel is provided with a floating axle having no fixed bearing, but being supported at each end on a three-point bearing composed of the running-wheels and the anti-friction rollers on the truck frame, all of the contacts being rolling contacts."

As already shown, the material feature of this three-point bearing was the application of roller bearings to the upper surface of the floating axle; but this axle had been previously carried in the angles formed by the rims of the four running-wheels of the Boyer patent. Still, under Clark's invention, the inertia-wheel axle was no longer an ordinary floating axle, but was effectually confined within rolling bearings. Further, the declared object of the patentee was to improve the efficiency of toys of this character, by imparting a greater velocity to the inertia-wheel while the toy was being prepared for operation, and "a much longer operative period and a higher initial speed" when the toy was "released for automatic operation." However, when the number of prior patents with their drawings and models appearing as exhibits in the present record are considered, it is plain that the art to which the present patent belongs had been so developed and exploited through competition in toy contrivances as materially to reduce the field for invention (as distinguished from mechanical skill) respecting operative means and appliances. We therefore conclude that the patent is entitled only to a limited range of equivalents; but this does not mean that such equivalency shall not be commensurate with the extent of the invention. McSherry Mfg. Co. v. Dowagiac Mfg. Co., 101 Fed. 716, 721, 722, 41 C. C. A. 627 (C. C. A., 6th Cir.); King Ax Co. v. Hubbard, 97 Fed. 795, 803, 38 C. C. A. 423 (C. C. A., 6th Cir.); Bundy Mfg. Co. v. Detroit Time Register Co., 94 Fed. 524, 538, 540, 36 C. C. A. 375 (C. C. A., 6th Cir.); Paper Bag Patent Case, 210 U. S. 405, 415, 28 Sup. Ct. 748, 52 L. Ed. 1122.

2. *The Alleged Infringing Patented Device.* This is covered by letters patent granted to defendant Clark April 27, 1909. The preferred form of the alleged infringing structure may for present purposes be described thus: A toy formed of sheet metal and in imitation of an automobile touring car; the front wheels, called steering-wheels, are mounted on a pivoted axle which may be so adjusted as to cause the toy to travel either in a stright line or in a circle; the rear wheels, called driving-wheels, are mounted on an axle, which in turn is movably mounted (in slots) on the body portion of the vehicle, so that the rear portion of the body may have a downward, and the axle, a forward, movement. While the steering and driving wheels are the same

in diameter, and when traveling in a straight line run in the same plane, the two sets are placed and operated at considerable distance apart. A shaft carrying an inertia-wheel, and extending through openings in the side walls of the body of the toy, is maintained in front of the driving-wheels (at an elevation slightly greater than that of the center line of their axle) and mounted on and held in place by rolling contacts. The contacts with the shaft are at points as follows: On its lower rearward quarter with the rims of the driving wheels; on its corresponding forward quarter, with the peripheries of two anti-friction rollers suitably adjusted upon and pivoted to the inner surfaces of the side walls of the body; and on the center of its upper half with the peripheries of two anti-friction rollers similarly adjusted and pivoted. The ends of the shaft extending beyond the side walls of the toy are enlarged and so grooved as to form friction pinions, which co-operate with beveled contact surfaces formed on the rims of the driving-wheels; and the weight of the rear portion of the toy is thus supported upon such beveled surfaces of the driving-wheels and not upon the axle. Further, as the specification states, the "driving member" engages the "driven member" with a "wedging action," which is designed to increase the frictional contact and to give an improved result in the transmission mechanism. Two claims are made in the letters patent, the first of which is given in the margin;[3] and this claim is the same as the second, except that the latter calls for an axle "movably" mounted and omits the following words found in the first claim: "Said axle and said shaft being relatively movable."

We may now compare the essential features of the alleged infringed and infringing devices; and it should be remembered that we are dealing with the operative parts of these devices. In both structures the shaft of the inertia-wheel is sustained in angles formed by four rolling bearings; in the first structure all these bearings are both ground and driving wheels, while in the second structure only the rear bearings are ground and driving wheels, the other two being anti-friction rollers; but in both structures, the shaft is held in its sustaining angles by two anti-friction rollers contacting with its upper surface. In both structures the combined weight of the shaft, inertia-wheel, and a substantial portion of the body of the toy, is employed through adjustment of the parts to keep the shaft in firm contact with all these wheels and rollers, and so to cause a "biting action" in the first and a "wedging action" in the second structure and for the avowed purpose of increasing the efficiency of the contact between the shaft and its bearings.

[3] "1. In a toy of the character described, the combination with a body portion, an axle mounted on said body portion, and ground wheels carried by said axle and having a plurality of frictional contact surfaces, of a shaft mounted on said body portion and having near each end thereof a plurality of frictional contact surfaces adapted to co-operate with the frictional contact surfaces of the respective ground wheels, the contact surfaces of both said shaft and said wheels being inclined to the plane of their rotation to afford a wedging effect, said axle and said shaft being relatively movable, and an inertia-wheel carried by said shaft whose weight coacts with the said frictional surfaces to hold them together with a wedging action."

Moreover, the "three-point bearing" found near each end of the shaft of the first structure was reproduced in the second, but with these differences in arrangement of parts: (1) The forward wheels of the first, considered as running-wheels, were replaced by the steering wheels of the second structure; (2) the use of these forward wheels as driving-wheels was transposed to the single set of driving-wheels of the second structure; and (3) their use as roller bearings for the shaft of the first was replaced by the two lower anti-friction rollers of the second structure.

The question then is whether this amounts to infringement. It must be conceded that there is a marked difference in appearance between the two structures. On the other hand, there is substantial identity between them in essence of elements and combination and in principle of operation; and they are the same in results attained. In saying this we are conscious of the rule that invention may consist of old elements so combined as to co-operate and produce a new and useful result (Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177; Ferro Concrete Const. Co. v. Concrete Steel Co., 206 Fed. 666, 669, 124 C. C. A. 466 [C. C. A., 6th Cir.]); but the Clark patents do not present two distinct and independent combinations. They have too many parts, discharging too many functions, that are common to both. Differences in words that are employed in either specification or claims of such patents respectively cannot, in spite of what is disclosed by the devices themselves, conceal the materiality in identity between the patents. Machine Co. v. Murphy, 97 U. S. 120, 125, 24 L. Ed. 935; Cantrell v. Wallick, 117 U. S. 689, 695, 6 Sup. Ct. 970, 29 L. Ed. 1017. It is true that, so far as their location is concerned, the front wheels of the first structure were omitted in the second; but we have seen that the functions they were designed to perform in the first were substantially replaced in the second structure. These wheels of themselves do not constitute a distinct and complete element of the patent in suit. For present purposes, however, they may be so regarded, and they or their substantial equivalent be treated as necessary to the effective operation of the machine. Still the changes wrought do not amount to an omission of both an essential element and a substantial mechanical equivalent. Union Paper Bag Machine Co. v. Advance Co., 194 Fed. 126, 138, 114 C. C. A. 204, and citations (C. C. A., 6th Cir.).

Clark could not omit these forward wheels and utilize their functions as he did, and at the same time escape the charge of infringement, unless he observed the settled rule that if one omits entirely an ingredient of a patented combination he must do so without substituting any other, or he must substitute one that is new or that performs a substantially different function, or, if old, that was not known at the date of the patent in suit as a proper substitute for the omitted ingredient. Gill v. Wells, 89 U. S. (22 Wall.) 1, 28, 22 L. Ed. 699; Imhaeuser v. Buerk, 101 U. S. 647, 656, 25 L. Ed. 945. Surely continuing to mount the shaft within rolling contacts in the same position and for the same purpose as before, and simply substituting the lower two roller bearings for the wheels in question, was not, so far as maintaining the shaft within such bearings is concerned, to introduce anything new, or anything unknown

as a proper substitute, or any substantial difference in function; for, as we have seen, Clark himself had previously devised the use of like rollers for a kindred and obviously analogous purpose in the patent in suit and for years had applied them to such use. It is equally clear that, when Clark transposed the driving function of these·wheels to his two driving-wheels, he simply changed the form, not the substance, of the old rolling contacts (Devlin v. Paynter, 64 Fed. 398, 400, 12 C. C. A. 188 [C. C. A., 3d Cir.]; Bundy Mfg. Co. v. Detroit Time Register Co., 94 Fed. 524, 538, 36 C. C. A. 375 [C. C. A., 6th Cir.]); and even if he so enhanced the frictional efficiency of such contacts, he did not materially change the mode of operation or produce a new result, and so could not in this way escape infringement (Marsh v. Seymour, 97 U. S. 348, 359, 24 L. Ed. 963; Hoyt v. Horne, 145 U. S. 302, 309, 12 Sup. Ct. 922, 36 L. Ed. 713; Macomber on Fixed Law of Patents [2d Ed.] p. 411, § 455).

Further, the changes here made are analogous in principle to those involved in Morgan Engineering Co. v. Alliance Mach. Co., 176 Fed. 100, 109, 100 C. C. A. 30 (C. C. A., 6th Cir.); and when we look at the substance of things, as distinguished from their form, there would seem to be in the infringing device here as clearly an embodiment of the patent in suit as there was in the infringing structure of the patent involved there; for, as Mr. Justice Clifford said in Machine Co. v. Murphy, supra, 97 U. S. at page 125, 24 L. Ed. 935:

"The substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself." Winans v. Denmead, 15 How. 330, 342, 14 L. Ed. 717: Devlin v. Paynter, supra, 64 Fed. 400, 12 C. C. A. 198; Hoyt v. Horne. supra, 145 U. S. 309, 12 Sup. Ct. 922, 36 L. Ed. 713; Cantrell v. Wallick, supra, 117 U. S. 693, 6 Sup. Ct. 970, 29 L. Ed. 1017.

We are consequently satisfied that there is no sufficient reason to restrict the invention in suit to the particular form preferred and described in the specification (National Tube Co. v. Marks, 216 Fed. 507, 133 C. C. A. 13, decided by this court July 25, 1914; Hoyt v. Horne, supra, 145 U. S. 309, 12 Sup. Ct. 922, 36 L. Ed. 713); and, although the range of equivalency is limited, as stated, we hold that the claims are each infringed.

[3] In reaching this conclusion we are not unmindful of the language of the claims of the patent; as, for example, each claim calls for "two pairs of running-wheels having parallel axles." We have seen that such wheels (obviously with parallel axles) were embraced in the Boyer patent, and that the invention of Clark was distinctly additional to that of Boyer. The merit of Clark's invention was the release it gave to the Boyer device, as also to friction-driven devices generally, from undue frictional resistance to free operation. Even the rigor of the rule which ordinarily confines a patentee to the language he has used in stating his claims is not of such a hard and fast fiber as to suffer appropriation of the essence of such an invention as this, simply because the patentee employed fit words to apply his improvement to an earlier invention; certainly there is no such degree of absolutism in the rules of construction as to require such a course to be pursued in the instant case, for that would be (as we have said of his contesting title) to permit Clark

both to sell and keep his invention. Macomber, Fixed Law of Patents (2d Ed.) p. 16; Bundy Mfg. Co. v. Detroit Time Register Co., supra, 94 Fed. 539, 540, 36 C. C. A. 375.

*Other Alleged Infringing Devices.* It is to be observed that plaintiff did not in its original bill or any of its amended forms specifically describe any alleged infringing device, and that the answer in its original and amended forms denies the averments of infringement. In addition to his infringing patented device, Clark manufactured and sold two other types of machines, called defendant's "power arrangement" of 1910 and 1911, respectively, and but little need be said of these devices. The first involved a change from single to double roller bearings at the ends of the inertia-wheel shaft. These rollers are mounted on the ends of pivots which pass through the side walls of the toy, each pivot carrying a roller on the exterior and interior surfaces of the walls, and the upper sets of rollers are removed to points forward and nearly in vertical line with the location of the forward lower rollers. The 1911 power arrangement changes the location of the inertia-wheel shaft to points on the rims of the driving wheels directly above the ends of their axle, and the location of the roller bearings to points immediately above and near the ends of the shaft, where they contact with its forward and rearward quarters; one roller being pivoted to the interior and the other to the exterior surface of each wall of the toy. It is to be noted of these changes in power arrangement that in both instances the three-point bearing is preserved at the ends of the shaft; further, they are but relocations of the points of contact between the inertia-wheel shaft and its rolling bearings. The relations between and the interdependence of the parts remain substantially the same as they existed in the patented infringing structure. The efforts made to justify these structures under Pilbrow's patent (1843), which was designed for steam engines, or Smith's patent (1890), which was devised as a gearing for motor cars, are sufficiently answered (1) by the fact that if those devices were operative, which is doubtful, they are so materially unlike the devices in issue here as to be inapplicable, and (2) by the continuing practical appropriation, through Clark's infringing devices, of the gist of the patent in suit. It cannot well be claimed that either the 1910 or the 1911 structure was not, both as to functions and manner of operation, the substantial equivalent of its immediate predecessor; and it need not be said that, if we are right in our conclusion as to the infringing character of the device made in accordance with Clark's infringing patent (the immediate predecessor of the 1910 structure), it follows that the changes of 1910 and 1911 are not sufficient to avoid infringement.

[4] 3. *The Turner Patents.* These patents were applied for March 5, 1909, and, as stated, were issued in the name of John C. Turner, assignor, to the plaintiff; the first, No. 930,107, on August 3, 1909, and the other, No. 930,633 August 10th of that year. Concededly the subjects of these patents were each in form and design conceived and as many as 50 hand-made samples of them made, in the shop of D. P. Clark & Co. more than two years before the date of application. Con-

cededly Turner was then in the employ of the partnership as foreman of its construction department, and there is sharp conflict in the testimony as to whether Clark himself did not conceive and suggest the idea and plan of each device; Turner doing nothing more of importance than to carry out Clark's directions. However, it is not necessary to attempt to reconcile this conflict, because we are satisfied that some of the sample toys were exhibited with the view of effecting sales, and to all intents and purposes toys of these types were sold more than two years prior to the application. This occurred as early as February, 1907, and the judicial sale of the assets was confirmed February 5, 1909. Meanwhile these classes of toys had been regularly manufactured and sold by the partnership without objection on the part of Turner and without apparent purpose of any one connected with the business to apply for patents. It was not until March 5th following the judicial sale, as we have seen, that Turner declared himself as the inventor of the articles. Of course, sales of the toys made within the two-years period do not of themselves show that similar sales were made before; but Turner's long acquiescence tends to show that the purpose was, when the toys were originally devised (no matter by whom), to treat the designs as ordinary copartnership developments of the toy art, and so to forego any claim of invention. Atlantic Works v. Brady, 107 U. S. 192, 199, 200, 2 Sup. Ct. 225, 27 L. Ed. 438; Egbert v. Lippman, 104 U. S. 333, 337, 26 L. Ed. 755. This also adds to the probability of truth in the evidence adduced that sales, as well as the incidental public use attending such transactions, actually took place and with Turner's consent prior to the two-years period.

The court below found that the defense of prior use and sale had been established, and so decreed that the patents were invalid. We concur in this conclusion. In doing so we have in mind the insistence of counsel that the portions of these toys which are claimed to have been covered by the Turner patents—that is, the bodies of the toys—had not been perfected when the sales were made. This is based upon the theory that these portions were hand-made and not machine-made. We are convinced, however, that there was no material difference between these portions of the toys whether produced by hand or machine; and it is to be remembered, as before pointed out, that the operative parts of the toys—the friction-driven device covered by the Clark patent in suit—had admittedly been perfected long before. The sales were made through accepted orders upon the exhibition and faith of the samples so produced, and were carried out in accordance with the established course of business of the partnership; and we think this was sufficient under the familiar and settled doctrine of sales. Plimpton v. Winslow (C. C.) 14 Fed. 919, 921, per Lowell, C. J.; Egbert v. Lippman, supra, 104 U. S. 336, 26 L. Ed. 755; Worley v. Tobacco Co., 104 U. S. 340. 343, 344, 26 L. Ed. 821; Dalby v. Lynes (C. C.) 64 Fed. 376 378, per Putnam, C. J. The fact that the purchasers were, according to their custom of dealing with D. P. Clark & Co., given the right slightly to reduce the number of articles ordered, cannot alter the effect of the sales made; and since this privilege did not extend to anything like the whole number of articles ordered, the present case is broadly

distinguishable from William B. Mershon & Co. v. Bay City Box & Lumber Co. (C. C.) 189 Fed. 741, 748, where Judge Denison held that a sale "on trial" of a single machine did not constitute a sale within the meaning of section 4886 (Comp. St. 1913, § 9430).

[5, 6] 4. *Unfair Competition.* The averments made in this respect are at best meager, and are confined to the two suits upon the Turner patents. The plaintiff corporation was created under the laws of Ohio, and is located and doing business in the city of Dayton in that state; and the defendant is a citizen and resident of the same state and city. The amended bill upon the first Turner patent in form contains only one cause of action, comprised in several counts. After the usual averments of infringement, it is stated that "in thus copying your orator's patents and designs" the defendant "has been guilty of unfair competition with your orator." In the last amended bill in the suit upon the second Turner patent, plaintiff in terms introduces a second cause of action, and avers that defendant is using "designs, dies, and patterns" of plaintiff in the manufacture of locomotive toys, "which are a close imitation" of plaintiff's toys, "and is selling the same in competition" with plaintiff; that this has resulted in depriving plaintiff of "a large share of the good will," etc., which, "but for the unlawful competition, it would have held' and enjoyed."

In view of the invalidity of the Turner patents and the lack of diversity of citizenship, we do not think this court has jurisdiction to pass upon the question of unfair competition. We are aware of decisions to the contrary. It is in effect said and with much force in some of the cases that a court once acquiring jurisdiction under an act of Congress, say in a patent or trade-mark suit, may determine an issue of unfair competition, and this upon the principle that the court, having acquired jurisdiction for one purpose, may, in spite of the failure of that purpose, retain the case and determine other questions without respect to the citizenship of the parties; but we think this is opposed to the rule laid down respecting this class of cases in Leschen Rope Co. v. Broderick, 201 U. S. 167, 172, 26 Sup. Ct. 425, 50 L. Ed. 710, affirming decision below 134 Fed. 571, 572, 67 C. C. A. 418 (C. C. A., 8th Cir.), approved and reaffirmed in Standard Paint Co. v. Trinidad Asph. Co., 220 U. S. 446, 460, 31 Sup. Ct. 456, 55 L. Ed. 536. See, also, Cushman v. Atlantis Fountain Pen Co. (C. C.) 164 Fed. 94, by Judge Lowell; Bernstein v. Danwitz (C. C.) 190 Fed. 604, 605 and citations; King & Co. v. Inlander (C. C.) 133 Fed. 416; Meckey v. Grabowski (C. C.) 177 Fed. 591, 592; Johnston v. Brass Goods Co. (D. C.) 201 Fed. 368; Keasby & Mattison Co. v. Philip Cary Co. (C. C.) 113 Fed. 432. Contra, Onondaga Indian Wigwam Co. v. Ka-Noo-No Indian Mfg. Co. (C. C.) 182 Fed. 832, 833; Woods Sons Co. v. Valley Iron Works (C. C.) 166 Fed. 770. The opinion of Judge Severens in Globe Wernicke Co. v. Fred Macey Co., 119 Fed. 696, 56 C. C. A. 304 (C. C. A., 6th Cir.), is explained by the averment and fact of diversity of citizenship appearing in the record; and the opinion of Judge Knappen in Samson Cordage Works v. Puritan Cordage Mills, 211 Fed. 603, 128 C. C. A. 203 (C. C. A., 6th Cir.), discloses such diversity.

The decree in case No. 2443, concerning the Clark patent in suit, is

reversed and remanded, with costs, and the usual decree for injunction and accounting will be entered; and the decrees in cases Nos. 2444 and 2445 are each affirmed, with costs.